Filed 3/22/24  P. v. Diaz CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B323131 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. BA225116 |
| v. | |
| JUAN ANTONIO DIAZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Terry A. Bork, Judge.  Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Juan Antonio Diaz appeals from the superior court's order denying his petition to vacate his murder conviction under Penal Code section 1172.6.[1]  We conclude substantial evidence supports the court's findings, after an evidentiary hearing and beyond a reasonable doubt, that Diaz was a major participant in an attempted robbery and he acted with reckless indifference to human life.  Therefore, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

1. ***The Trial***

    a.     *The crimes*[2]

The People charged Diaz with the murder of Hector Quevado (§ 187, subd. (a)) and the attempted second degree robbery of a different victim (§§ 211, 664).  The People also alleged gang and firearm enhancements (§§ 186.22, subd. (b)(1), 12022.53, subds. (d), (e)(1)).

At trial, the People presented evidence that Diaz, Abel Lopez, and Modesto Torres were members or associates of the "Crazies" gang, with the monikers "Lonely," "Snoopy," and "Chato," respectively.

On October 30, 2001, Torres was walking home when he saw Diaz and Lopez in a stolen white Toyota Camry.  Both Diaz and Lopez were 19 years old at the time.  Lopez was driving

---

[1]    References to statutes are to the Penal Code.  Effective June 30, 2022, former section 1170.95 was renumbered to section 1172.6 with no change in text.  (Stats. 2022, ch. 58, § 10.)

[2]    We take our statement of facts from the testimony at Diaz's trial.  We previously granted the Attorney General's Request for Judicial Notice of the reporters' and clerk's transcripts from the trial.

and Diaz was in the front passenger's seat. Diaz and Lopez invited Torres to drive around with them, and he agreed.

After visiting a restaurant, the group saw a teenage boy riding a bicycle. Lopez made a sharp right turn and stopped the car, nearly hitting the bicyclist. Lopez yelled at Diaz to "jack" the bicyclist, i.e. to rob him. Diaz got out of the car, ran after the bicyclist, and threatened to beat the teenager unless he handed over the bicycle. The teenager refused and rode away. Diaz very briefly chased after him before getting back in the car.

After the attempted robbery, Torres asked Lopez to take him home because he did not "want to get involved in all that thing." Diaz and Lopez told Torres to "shut up," and said, "Don't be a [wimp]."

The group stopped at a gas station to fill up the car around 9:30 p.m. Lopez started talking to a woman standing nearby, who appeared to be working as a prostitute. The woman made a motion toward Quevado, who was standing across the street. Lopez became angry when he saw Quevado.

Lopez drove Diaz and Torres across the street, and he stopped the car near Quevado. Diaz got out of the Camry. Lopez opened the driver's side door and put his left leg on the ground, while keeping his right leg inside the car.

Diaz and Lopez repeatedly asked Quevado, in an angry tone, why he was "pimping" in their "hood." Diaz approached Quevado and threatened to beat him up unless he turned over his " 'money, wallet, everything you have.' " Quevado said he "didn't have nothing," and Diaz swung his fist at Quevado.

Diaz told Lopez to " '[h]it him up.' " Diaz and Lopez then asked Quevado, " 'Where you from?' " Quevado responded that he is from Temple, which is a rival gang to the Crazies.

3

After Quevado identified his gang, Lopez pulled out a gun and fired four to five shots at him. Quevado fell to the ground. According to Torres, Diaz told Lopez to stop shooting, and the two got back in the car.[3] Lopez fired two or three more shots at Quevado from inside the car and then drove away. Diaz did not try to stop Lopez from shooting the gun. Three bullets ultimately hit Quevado, two of which were fatal.

As they drove away, Lopez told Torres not to " 'snitch' " or mention the shooting. Torres again asked Lopez to take him home. Lopez replied, " 'I'm going to take you home, you little [wimp], because you whine too much.' " Diaz was silent.

The next evening, October 31, 2001, Diaz attended a large party at which Lopez, Torres, and other Crazies gang members were present. The party was only a few blocks from the scene of the shooting. Around 3:30 a.m., officers spotted the stolen Camry parked near the party. Torres was sitting in the driver's seat and Diaz was in the front passenger's seat.

When the officers passed the Camry, Diaz, Torres, and another person ran from the car. Officers eventually found Diaz lying face down on the ground in a dark area. About two feet away from Diaz, officers found a handgun the same caliber as that used in the shooting. Officers searched Diaz and found a "shaved key," which is essentially a "skeleton key" that could be used to start a variety of Toyotas.

b.      *Witness intimidation*

Torres was the prosecution's main witness at trial, and he testified to most of the facts summarized above. Torres had previously testified against Diaz at the preliminary hearing.

---

[3]      Torres revealed this fact for the first time at trial.

According to Torres, after the preliminary hearing, Diaz's brother, Hugo, showed up at his house dressed in a delivery-person uniform. At the time, Torres did not know Hugo, nor did he know Hugo was Diaz's brother. Hugo told Torres someone had sent him a computer, and he convinced Torres to drive with him to a warehouse to get it. Hugo instead drove Torres for 45 minutes to the Angeles Crest Forest. Hugo stopped the truck, put on gloves and a sweater, and asked Torres, " 'Why you snitching, fool?' " Hugo tried to force Torres to walk with him into the forest, but Torres escaped and ran to safety.

      c.     *Gang testimony*

The prosecution's gang expert testified the Crazies is a gang whose members claim as their territory the locations of the attempted robberies and shooting. According to the expert, gangs use their territory to commit crimes. Some of the Crazies' primary criminal activities included homicides, assaults with firearms, and prostitution.

The expert explained it is the "ultimate sign [of] disrespect" to make money in a gang's territory if you are not a member of that gang. It is significantly worse if the person making money is a member of a rival gang. If a gang member is caught in a rival gang's territory, it is "very likely" he will be killed. Asking a gang member " 'where you from' " is a challenge likely to provoke a violent response, and it is a common prelude to a shooting.

The expert testified that "Temple Street" and Crazies are rival gangs. Around the time of the shooting, the police had noticed graffiti with the names of both gangs crossed out next to the number 187. The graffiti signified the gang members from both sides were looking to kill members of the other gang. The

expert explained the graffiti was akin to a declaration of war against the rival.

      d.    *Diaz's accounts of the incidents*

Police officers interviewed Diaz about the shooting. Diaz told them he and Lopez were friends and had known each other for five years. Diaz said he is "from" Crazies, but he had not been "jumped in." Torres and Lopez were also from Crazies.

Diaz initially suggested he and Lopez met the day of the shooting because Diaz had the stolen Camry, and Lopez wanted to get it from him. Later, Diaz said Lopez picked him up in the Camry around two or three in the afternoon.

Diaz admitted being present for the Quevado shooting. Diaz told police he said " '[h]it him up' " and then asked Quevado " '[w]here you from?' " Quevado responded, "Temple Street," and Lopez started shooting him. Diaz claimed he did not know Lopez had a gun.

Diaz testified in his own defense at trial. He admitted intending to commit the robberies, but he insisted he was acting according to Lopez's instructions. According to Diaz, Lopez told him to "hit [Quevado] up." Diaz then challenged Quevado by asking him " '[w]here are you from?' " Diaz claimed he did not know Lopez had a gun and was shocked when he started shooting. After Diaz got back in the car, he asked Lopez why he did that, but Lopez did not respond. Lopez drove for a block and dropped off Diaz and Torres.

      e.    *The verdict and sentencing*

The jury convicted Diaz of first degree murder and attempted second degree robbery. (*People v. Diaz* (Aug. 30, 2004, B169353) [nonpub. opn.].) The jury found true allegations that Diaz committed the crimes for the benefit of a criminal street

6

gang and that a principal personally and intentionally discharged a firearm causing Quevado's death. The trial court—the Honorable Marsha N. Revel—sentenced Diaz to a term of 50 years to life in prison. On August 30, 2004, this division affirmed Diaz's conviction. (*Ibid.*)

## 2.     *Diaz's petition for resentencing*

After Senate Bill No. 1437 took effect, Diaz filed, on April 22, 2019, a petition for resentencing under section 1170.95. At a hearing on the petition, the superior court concluded, "the evidence at trial, as described in the court of appeal's opinion, show[s] that the defendant was a major participant in the crime and acted with reckless indifference" to human life within the meaning of sections 189, subdivision (e)(3) and 190.2, subdivision (d). The court stated Diaz therefore was "not eligible for relief" and denied his petition.

Diaz appealed, arguing the superior court erred by denying his petition based on the Court of Appeal's opinion without permitting him to present new evidence as well as argument on accomplice liability. We agreed and reversed the order. (See *People v. Diaz* (Dec. 23, 2020, B301598) [nonpub. opn.].) We remanded the case for the superior court to issue an order to show cause and to proceed to an evidentiary hearing at which the prosecution had the burden of proving beyond a reasonable doubt that Diaz is ineligible for resentencing and both parties could offer new or additional evidence to meet their respective burdens. (*Ibid.*)

The superior court complied with our directions and held an evidentiary hearing to reconsider Diaz's petition. Neither side presented new evidence at the hearing. After listening to argument, the court discussed each factor identified by the

7

California Supreme Court as relevant to determining whether a defendant was a major participant in a felony and acted with reckless indifference to human life.  We discuss the court's findings in more detail below.  The court concluded, beyond a reasonable doubt, Diaz was guilty of felony murder as a major participant in the robbery who acted with reckless indifference to human life.  Accordingly, the court denied Diaz's resentencing petition.

Diaz timely appealed.

## DISCUSSION

1.   *Section 1172.6*

"In Senate Bill No. 1437 (2017–2018 Reg. Sess.) . . . , the Legislature significantly narrowed the scope of the felony-murder rule.  It also created a path to relief for defendants who had previously been convicted of murder on a felony-murder theory but who could not have been convicted under the new law.  Resentencing is available under the new law if the defendant neither killed nor intended to kill and was not 'a major participant in the underlying felony [who] acted with reckless indifference to human life, as described in subdivision (d) of [Penal Code] section 190.2' (Pen. Code, § 189, subd. (e); see *id.*, § 1172.6; Stats. 2018, ch. 1015, §§ 3–4; Stats. 2022, ch. 58, § 10)."  (*People v. Strong* (2022) 13 Cal.5th 698, 703 (*Strong*).)

Section 1172.6 provides a mechanism by which a person convicted of murder under the former law may be resentenced if he could no longer be convicted of murder because of the changes to section 188.  (*Strong, supra,* 13 Cal.5th at p. 708; see generally *People v. Gentile* (2020) 10 Cal.5th 830, 843; *People v. Lewis* (2021) 11 Cal.5th 952, 959–960.)  Once a petitioner establishes a prima facie case for relief and the superior court issues an order

8

to show cause, the matter proceeds to an evidentiary hearing at which it is the prosecution's burden to prove beyond a reasonable doubt that the petitioner is ineligible for resentencing. (*Strong*, at pp. 708–709; *People v. Vargas* (2022) 84 Cal.App.5th 943, 951 (*Vargas*).)  If the superior court finds beyond a reasonable doubt that the petitioner is guilty of murder notwithstanding the amendments to sections 188 and 189, the petitioner is ineligible for relief under section 1172.6. (*Strong*, at pp. 708–709; *Vargas*, at p. 951.)

## 2.    *Our standard of review*

While the superior court acts as an independent factfinder in determining whether the People have met their burden, on appeal the reviewing court applies the substantial evidence standard.  (*Vargas*, *supra*, 84 Cal.App.5th at p. 951; *People v. Garrison* (2021) 73 Cal.App.5th 735, 745, 747.)  Under this familiar standard, we review the entire record in the light most favorable to the order to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Vargas*, at p. 951; *People v. Clements* (2022) 75 Cal.App.5th 276, 298.)  "We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)  In so doing, a reviewing court presumes in support of the order the existence of every fact the trier could reasonably deduce from the evidence.  (*People v. Nieber* (2022) 82 Cal.App.5th 458, 476 (*Nieber*); *People v. Owens* (2022) 78 Cal.App.5th 1015, 1022 (*Owens*).)  Substantial evidence also includes circumstantial

9

evidence and any reasonable inferences drawn from that evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 57; *Nieber*, at p. 476.)

We resolve all evidentiary conflicts and questions of credibility in favor of the order. (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1014, quoting *People v. Cardenas* (2015) 239 Cal.App.4th 220, 226–227.) We cannot reweigh the evidence or reassess witness credibility on our own. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 [resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact].)

**3.  *Substantial evidence supports the superior court's finding beyond a reasonable doubt that Diaz is ineligible for relief under section 1172.6***

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), and again in *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*), our Supreme Court identified the overlapping factors for assessing whether the defendant was a major participant in an underlying serious felony and acted with reckless indifference to human life for purposes of section 190.2, subdivision (d), and thus for section 189, subdivision (e)(3). These three cases charted a "spectrum of culpability" set forth in two opinions from the United States Supreme Court: *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*).

"[I]t is important to consider where the defendant's conduct falls on the 'spectrum of culpability' that *Enmund* and *Tison* established. . . .  On one end of the spectrum is Enmund, 'the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.' " (*Scoggins, supra*, 9 Cal.5th at p. 675.) At the other end

10

of the spectrum are the 19- and 20-year-old defendants in the *Tison* case, who were major participants who acted with reckless indifference to human life, even though neither of them shot any murder victim. (*Tison*, *supra*, 481 U.S. at pp. 139–142, 158.) The California Supreme Court has embraced these federal decisions as "instructive." (*Scoggins*, at p. 675.)

In *Banks* the Supreme Court listed the following factors to consider in determining whether the defendant was a major participant in one of the specified felonies: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks, supra*, 61 Cal.4th at p. 803.)

Reckless indifference to human life has a subjective and an objective element. As to the subjective element, the defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, and he must consciously disregard the significant risk of death his actions create. As to the objective element, the risk of death must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation. (*Scoggins, supra*, 9 Cal.5th at p. 677.)

In *Scoggins* the Supreme Court listed the following factors to consider in determining whether the defendant acted with reckless indifference to human life: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins, supra*, 9 Cal.5th at p. 677; see *Clark, supra*, 63 Cal.4th at pp. 618–622.)

The requirements for finding major participation and reckless indifference to human life significantly overlap, for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life. (*Clark, supra*, 63 Cal.4th at p. 615; see *Owens, supra*, 78 Cal.App.5th at p. 1023.) No one of these considerations is necessary, nor is any one of them necessarily sufficient. (*Scoggins, supra*, 9 Cal.5th at p. 677; see *Banks, supra*, 61 Cal.4th at p. 803.) "We analyze the totality of circumstances" (*Scoggins*, at p. 677; see *People v. Mitchell* (2022) 81 Cal.App.5th 575, 592) to determine whether Diaz acted with reckless indifference to human life.

We apply the *Banks/Clark/Scoggins* factors to the evidence here:

a.     *Major participant*

*Role in planning*. The superior court observed "[t]here's no evidence of planning, per se, on the part of either of the two

12

participants" with respect to the robbery of Quevado specifically. Nevertheless, there is substantial evidence Diaz and Lopez made a general plan to commit robberies that day.

At trial, the parties stipulated Lopez and Diaz were driving around in a stolen Camry the day of the shooting. Although Diaz testified that Lopez picked him up in the car, Diaz had previously suggested to the police he brought the car to Lopez. That conclusion is supported by the fact that the police searched Diaz and found he was carrying a "shaved key" capable of starting Toyotas. Moreover, about a day after the shooting, the police observed Diaz, but not Lopez, in the stolen car, which suggests Diaz was its primary caretaker.

The evidence also shows Diaz and Lopez were driving around for hours with no apparent destination in mind, suggesting they had intended to use the stolen car to commit crimes. When they eventually came across a teenager on a bike, Lopez drove the car very close to the teenager and told Diaz to "jack" him. Diaz got out of the car without hesitation and demanded the teenager's bike, suggesting he had anticipated committing a robbery. After the teenager escaped, Diaz willingly got back in the car, which indicates he had been a willing participant in the attempted robbery.

The record shows Diaz and Lopez continued to drive around aimlessly until they came across Quevado. As with the prior attempted robbery, Lopez drove up to the victim. Without hesitation or any prompting from Lopez, Diaz got out of the car and demanded Quevado's property.

Considered together, this is strong circumstantial evidence the attempt to rob Quevado—although not specifically planned— was part of a more general plan by Diaz and Lopez to commit

13

robberies that day. It is also strong circumstantial evidence Diaz played a prominent role in forming that plan.

*Supplying weapons.* The superior court found, and the parties agree, there's no evidence Diaz gave Lopez the gun he used to shoot Quevado.

*Awareness of danger posed by nature of the crime, weapons used, or past experience or conduct of other participants.* Mere hours before attempting to rob Quevado, Diaz and Lopez attempted to rob a different victim using a remarkably similar modus operandi. Like the attempt to rob Quevado, Lopez drove a stolen car close to the victim. Diaz got out of the car, demanded the victim's property under threat of physical harm, and then returned to the car to flee with Lopez.

It also is reasonable to infer Diaz was aware any attempt to rob Quevado would be more dangerous than a typical robbery. According to Torres, the confrontation began with Diaz and Lopez repeatedly asking Quevado, in an angry tone, why he was "pimping" in their "hood." Those comments indicate Diaz believed Quevado had been procuring a prostitute in his gang's territory. Diaz also directed a gang challenge at Quevado— "where you from"—which indicates he suspected Quevado was a gang member. Given Diaz's history of associating with the Crazies gang, it is reasonable to infer he was aware there was a significant risk the encounter would turn violent, depending on how Quevado responded to the gang challenge.

*Defendant's presence at scene of killing, in a position to facilitate or prevent the actual murder; role of defendant's own actions or inaction in the death.* The record shows Diaz was present at the scene and played a significant role in escalating the incident from an attempted robbery to a gang killing.

14

According to Torres, Diaz approached Quevado and demanded he turn over his property. Lopez did not direct or instruct Diaz; Diaz got out of the car and attempted to rob Quevado entirely on his own. When Quevado claimed not to have anything valuable, Diaz swung his fist at Quevado, told Lopez to " '[h]it [Quevado] up,' " and directed a gang challenge at Quevado by asking him " '[w]here you from?' " As the superior court observed, Diaz's actions steered the confrontation towards violence and "elevated this tragic situation from a mere strong arm robbery to something more dangerous."

We acknowledge there is some evidence Diaz tried to restrain Lopez. Torres testified that Diaz told Lopez to "stop shooting" during the first flurry of bullets. However, the superior court reasonably could have disregarded this testimony as not credible. Torres revealed this information for the first time at trial. Torres also testified that Diaz's brother had threatened him after he testified against Diaz at the preliminary hearing. This threat provided a significant incentive for Torres to fabricate evidence favorable to Diaz.

Even if Diaz had initially directed Lopez to stop shooting, the record shows he made no similar attempt to stop Lopez from opening fire on Quevado a second time. According to Torres, Diaz and Lopez got back into the car after Lopez fired the initial shots. Lopez was in the driver's seat, and Diaz was in the front passenger's seat. Lopez then fired two or three more shots at Quevado, who was lying on the ground. It is possible those were the shots that ultimately killed Quevado. Diaz certainly knew by that point Lopez had a gun he was willing to use, and Diaz was close enough to Lopez to intervene physically. According to Torres, Diaz instead sat silently as Lopez repeatedly fired at a

15

defenseless victim. (*In re McDowell* (2020) 55 Cal.App.5th 999, 1013–1015 [defendant "was present when the violence ensued but took no steps to prevent it"; even accepting defendant's "self-serving statements after the crime that he did not know [shooter] had a gun," he "knew, by no later than the warning shot, that [shooter] was both carrying and willing to fire a gun"].)

*Actions after the use of lethal force*. Diaz fled with Lopez immediately after the shooting. There's no indication Diaz tried to call for help for Quevado or report Quevado's injuries to anyone who could provide aid. The next day, Diaz attended the same party as Lopez, which was held at a house only a few blocks from the scene of the murder.

b.    *Reckless indifference to human life*

*Use of gun or knowledge a gun would be used*. The superior court found Diaz was not armed with, and did not use, a gun. Nor is there direct evidence Diaz knew Lopez had a gun before Lopez fired the first shots.

Nevertheless, the superior court noted there is some circumstantial evidence suggesting Diaz was aware Lopez was armed before he attempted to rob Quevado. As we discussed above, Diaz's comments during the attempted robbery indicate he suspected Quevado was a member of another gang and engaged in criminal activity inside the Crazies' territory. Given Diaz's history of associating with the Crazies gang, it is reasonable to infer he was aware there was a significant risk of violence if he attempted to rob Quevado under those circumstances. For the same reasons, it also is reasonable to infer Diaz believed Quevado might be carrying a weapon. Diaz nevertheless singlehandedly approached and attempted to rob Quevado, swung his fist at Quevado, and directed a gang

16

challenge at Quevado.  It is reasonable to infer Diaz would not have acted so cavalierly unless he knew Lopez or Torres had access to some sort of weapon.  Moreover, the fact that Lopez and Torres remained at a distance during the encounter suggests Diaz knew the weapon was a gun.

*Number of weapons ultimately used*.  There was evidence only of one gun.

*Physical presence at the scene and opportunity to restrain the crime*.  As we discussed, Diaz was present during the shooting, but it is not clear whether he was close enough to Lopez to stop him from firing the initial shots at Quevado.  However, Diaz certainly was close enough to Lopez to attempt to prevent him from firing the second series of shots.  Rather than doing so, the record shows Diaz sat silently in the passenger's seat as Lopez fired at a defenseless, prone victim.  (See *In re McDowell, supra*, 55 Cal.App.5th at pp. 1013–1015; *Clark, supra*, 63 Cal.4th at p. 619 [" 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state' "]; *Nieber, supra*, 82 Cal.App.5th at pp. 478–479 [defendant present at robbery; didn't intervene to prevent murder]; cf. *Scoggins, supra*, 9 Cal.5th at p. 678 [defendant, who remained at nearby gas station during the course of the crime, "was not in a position to restrain" the shooter]; *Banks, supra*, 61 Cal.4th at p. 807 [defendant "did not see the shooting happen, did not have reason to know it was going to happen, and could not do anything to stop it"]; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1025–1026 [defendant was "across the street" and "did not see or know if anyone was shot or hurt"].)

*Duration of interaction between perpetrators and victims.* The time from Diaz's initial confrontation until the shooting seems to have been relatively brief. Nevertheless, Diaz had many opportunities to try to deescalate the confrontation during that time. (See *In re McDowell, supra*, 55 Cal.App.5th at pp. 1005, 1012, 1014 [defendant was major participant who acted with reckless indifference even though "events unfolded quickly" after defendant and shooter entered victim's home, and whole incident took maybe a minute].)

*Defendant's knowledge of confederate's propensity for violence or likelihood of using lethal force.* The day of the shooting, Lopez nearly struck a teenager with his car while attempting to rob him of a bicycle. Diaz was in the car at the time, so he certainly was aware of Lopez's dangerous maneuver. Lopez's propensity for violence and willingness to use lethal force also would have been obvious to Diaz after Lopez fired the first series of shots at Quevado, but before he fired the second series.

*Efforts, if any, to minimize risks of violence during the felony.* Instead of working to alleviate the rising tensions and risk of violence, Diaz repeatedly exacerbated them. First, he turned a verbal confrontation into a physical one by swinging his fist at Quevado. Diaz then escalated the risk of violence further by instructing Lopez—a fellow gang associate—to " '[h]it [Quevado] up.' " Diaz escalated the risk of violence yet again when he directed a gang challenge at Quevado, " '[w]here you from.' " Once that risk materialized in the form of Lopez firing a series of shots at Quevado, Diaz did nothing to minimize the risk of further violence. Instead, he sat silently next to Lopez as he fired what may well have been the fatal shots.

18

c.    *Totality of the circumstances*

The record shows Diaz played a central role in forming and executing a plan to commit robberies, repeatedly escalated the risk of violence during the encounter with Quevado, and took no meaningful steps to protect or aid Quevado once that risk materialized.  Considering the totality of the circumstances in the light most favorable to the superior court's ruling—including Diaz's youth at the time of the incident—we conclude substantial evidence supports the superior court's finding that Diaz could be convicted of murder under the new felony-murder standard because he was a major participant in the underlying felony and acted with reckless indifference to human life.

We are not persuaded by Diaz's arguments to the contrary. According to Diaz, the record shows he intended only to commit an unarmed robbery at Lopez's direction, he had no reason to suspect Lopez was armed or would shoot the victim, and the murder was solely the result of Lopez's impulsivity and anger. Diaz arrives at these conclusions by viewing the evidence in the light most favorable to him, while overlooking or minimizing the evidence pointing to his guilt.  On appeal, we view the evidence in the opposite light, drawing all reasonable inferences in favor of the court's decision.  (*Vargas*, *supra*, 84 Cal.App.5th at p. 951.)  Where, as here, " 'the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the [order]'s reversal.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Diaz's reliance on *In re Ramirez* (2019) 32 Cal.App.5th 384 (*Ramirez*) is misplaced.  In that case, the 19-year-old defendant found two guns in an abandoned house.  He and three juveniles

19

decided they " ' "wanted to jack somebody." ' " (*Id*. at pp. 389–391.)  Later, Ramirez's 16-year-old friend Josh along with another juvenile jogged toward a truck in a parking lot across the street from a bar.  Josh had one of the guns.  Ramirez heard shots.  He gave Josh a ride away from the scene on the handlebars of his bike.  Ramirez told police he hadn't seen anything.  (*Ibid*.)

In vacating the jury's special circumstance finding, the appellate court noted that, although Ramirez "was in close proximity to the shooting," he was not "close enough to exercise a restraining effect on the crime or his colleagues." (*Ramirez, supra*, 32 Cal.App.5th at pp. 388, 391, 405.)  The court also stressed the lack of evidence showing Ramirez elevated the risk to human life beyond that inherent in any armed robbery. (*Id*. at pp. 405–406.)

Neither can be said for Diaz.  Unlike the defendant in *Ramirez*, Diaz was an active participant in the attempted robbery and within feet of the shooter when he fired the shots.  Even if Diaz had been too far away to stop the initial round of shots, he was seated directly next to Lopez in a small sedan when Lopez fired the second series of shots.  There also is ample evidence that Diaz's conduct significantly increased the risk the attempted robbery would turn violent.  Under these circumstances, it is reasonable to conclude Diaz is more culpable than the defendant in *Ramirez*.

Diaz next contends the superior court erred by failing to consider his relative youth—19 years old—at the time of the crime.  Although the court did not mention Diaz's age while reciting its factual findings, it is apparent the court considered it before reaching its final decision.  At the resentencing hearing,

Diaz's counsel argued his age was a relevant factor and "bears some serious analysis." After counsel finished her argument, the court invited the People to discuss "the issue of Mr. Diaz being apparently 19 years old at the time of this. [The District Attorney's office] has taken the position that the brain of a 19-year-old doesn't fully mature until age 25, even though they're adults. As a matter of law, your office takes the position that that brain isn't fully mature." From these remarks, it is apparent the court was aware of, and gave consideration to, Diaz's youth. We decline to second guess the court's implicit finding that Diaz's age did not warrant a decision in his favor.

Nor is remand required under *People v. Jones* (2022) 86 Cal.App.5th 1076. In *Jones*, the petitioner appealed after the superior court denied his resentencing petition at a March 2021 hearing. The Court of Appeal remanded the case on the basis that the superior court failed to discuss explicitly the petitioner's youth when he committed the crime. (*Id.* at pp. 1079, 1082.) The court explained in "the usual case, the fact that a court did not specifically mention certain evidence does not mean that the court 'ignored' that evidence. As [the petitioner] points out, however, it is unlikely in this particular instance that the trial court could have known to consider [the petitioner's] age and maturity level, particularly to the extent now required by cases issued after [the petitioner's] hearing." (*Id.* at p. 1092.) The cases to which the *Jones* court was referring were issued in February 2021, August 2021, November 2021, and March 2022. (See *People v. Harris* (2021) 60 Cal.App.5th 939; *In re Moore* (2021) 68 Cal.App.5th 434; *People v. Ramirez* (2021) 71 Cal.App.5th 970; *In re Harper* (2022) 76 Cal.App.5th 450.) Here, Diaz's resentencing hearing took place in July 2022,

21

well after all of those cases had been issued.  Given this timeline, the superior court should have known Diaz's age was relevant to the issues before it, and we may "presume the [superior] court followed the law in exercising its duties and duly considered the evidence presented to it."  (*Jones*, at p. 1092.)

We also reject Diaz's suggestion that he could not have acted with reckless indifference to human life because he was only 19 years old at the time of the crime.  "[T]he case law discussing the differences in brain development among youthful offenders (in contrast to their adult counterparts) stress[es] two areas of divergence:  (1) their relative impulsivity; and (2) their vulnerability to peer pressure.  (See, e.g.*, Miller* [*v. Alabama* (2012) 567 U.S. 460,] 461.)"  (*People v. Oliver* (2023) 90 Cal.App.5th 466, 489.)  The record does not indicate Diaz's criminal behavior was substantially motivated by either factor.  This is not a case where "a youthful offender was swept up in circumstances beyond his or her control that led to an unintended death."  (*Ibid.*)  Instead, Diaz and Lopez were similarly-aged peers who jointly formed a plan to commit a series of crimes to benefit their gang.  (Cf. *People v. Keel* (2022) 84 Cal.App.5th 546, 562 [15-year-old defendant who was given gang moniker at age six "would have felt pressure" to "go along with the robbery" instigated by older gang member].)  Diaz's "actions during this crime did not show 'a transient rashness' or 'inability to assess consequences.'  (*Miller* [*v. Alabama*]*, supra*, 567 U.S. at pp. 471–472.)  Nor do we perceive any ' "impetuosity" ' or ' "failure to appreciate risks and consequences." ' "  (*Oliver*, at p. 490; cf. *People v. Ramirez, supra*, 71 Cal.App.5th at pp. 975, 991 [15-year-old defendant " 'influenced by peer pressure' " and "afraid" of consequences if he didn't aid shooter].)

## DISPOSITION

We affirm the order.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:



EDMON, P. J.



LAVIN, J.